IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 24-cr-03065-SRB-01 |
| DEJUAN T. PARKER, | ) ) | |
| Defendant. | ) | |

# **ORDER**

Before the Court is Magistrate Judge Willie J. Epps Jr.'s Report and Recommendation (Doc. #65) to deny Defendant Dejuan T. Parker's ("Defendant") Motion to Suppress (Doc. #62). Neither party has filed a timely objection to the Report and Recommendation.

After an independent and careful review of the record, the applicable law, and the parties' arguments, the Court ADOPTS Judge Epps's Report and Recommendation (Doc. #65). It is ORDERED that the Report and Recommendation be attached to and made a part of this Order. Defendant's Motion to Suppress (Doc. #62) is DENIED.

**IT IS SO ORDERED.**

Dated: January 15, 2025

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:24-cr-03065-SRB-01 |
| | ) | |
| | ) | |
| DEJUAN T. PARKER, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Pending before the Court is Defendant Dejuan T. Parker's Motion to Suppress Wiretaps. (Doc. 54). The Government has filed its suggestions in opposition. (Doc. 59). Mr. Parker has filed a supplement to his Motion to Suppress. (Doc. 62). The Court held a hearing on this matter on December 19, 2024. (Doc. 64). Mr. Parker appeared in person, represented by Abram McGull. The Government was represented by Jessica Eatmon, an Assistant United States Attorney ("AUSA"). During the hearing, the parties offered a stipulation of facts in lieu of calling witnesses. In addition, the Government offered two exhibits, both certified copies of the two separate wiretap applications at issue, which were admitted. (Tr. 3:8-4:7). No other evidence was offered by either party. The issue is now ripe for consideration. For the reasons that follow, it is recommended that the motion be DENIED.

**I. Findings of Fact**

Based on the evidence presented at the hearing, the Court submits the following proposed findings of fact:

1. In the year prior to the application for wiretaps, the Drug Enforcement Administration ("DEA") and Springfield Police Department ("SPD") began investigating the

PARKER drug trafficking organization ("DTO") for trafficking methamphetamine in Springfield, Missouri (Gov't Ex. 1-3 at 17, Gov't Ex. 2-1 at 20).

2. The Government alleges that the investigation revealed that the PARKER DTO is a multi-member organization and multi-kilogram supplier of methamphetamine to the southwest Missouri area. (Gov't Ex. 1 at 17, Gov't Ex. 2-1 at 20).

3. In his first wiretap affidavit, DEA Task Force Officer ("TFO") Stephen Connor stated that investigators identified several cellular telephone numbers used by Mr. Parker to coordinate the methamphetamine distribution from Los Angeles, California, to the southwest Missouri area. (Gov't Ex. 1-3 at 17).

4. On December 5, 2023, agents met with a confidential source who stated Mr. Parker was utilizing a new telephone, Target Telephone 1, ending in 2132 ("TT1"). (*Id.* at 5, 28).

5. On January 3, 2024, agents met with the confidential source for the purpose of conducting a controlled purchase of methamphetamine from Mr. Parker. At agents' direction, the confidential source texted and called Mr. Parker on TT1. (*Id.* at 29).

6. On February 22, 2024, Special Assistant United States Attorney ("SAUSA") John Herries applied for an initial wiretap authorization for TT1. (Gov't Ex. 1). That same day, U.S. District Judge M. Douglas Harpool reviewed the affidavit, application, and order, and signed his approval. (Gov't Ex. 2-1 at 38).

7. During the interception period of TTI, agents learned that Mr. Parker was also using another target telephone ending in 3727 ("TT2"). (*Id.* at 4, 38).

8. On February 24, 2024, agents conducted surveillance of Mr. Parker when he arrived at the Springfield-Branson National Airport. While at the airport, agents observed Mr.

Parker utilize a cellular telephone to send text messages. The messages sent by Mr. Parker were not intercepted through the Title III intercepts indicating that Mr. Parker was utilizing TT2, a secondary cellphone. (*Id*. at 38).

9. Based on information obtained from cell-site simulators from three different locations where Mr. Parker was observed, agents knew Mr. Parker was in possession of at least two cell phones, TT1 and TT2, as he completed sales of methamphetamine. (*Id*. at 50).

10. On March 22, 2024, AUSA Jessica Eatmon applied for a second wiretap authorization for another 30-day period for TT1 and initiation of a wiretap for TT2. (Gov't Ex. 2). U.S. District Judge Roseann A. Ketchmark reviewed the wiretap order and signed her approval. (Tr. 11:24-12:13).

11. In both wiretap application affidavits, TFO Conner discussed information gathered from ordinary investigation techniques and detailed the limitations of each technique. (Tr. 11:18-23; Gov't Ex. 1-3 at 33–69; Gov't Ex. 2-1 at 73–115).

12. Regarding prior wiretaps, interception of TT1 did not lead to the identification of all those who distribute, store, or supply drugs for Mr Parker. (Gov't Ex. 1-3 at 36-37, Gov't Ex. 2-1 at 74-75).

13. Regarding confidential sources and witnesses, TFO Conner explained that information from confidential sources was not sufficient to allow agents to identify the suppliers or all members or gain a full understanding of the DTO's operations and scope. (Gov't Ex. 1-3 at 36-38, Gov't Ex. 2-1 at 75-78).

14. Regarding undercover agents, TFO Conner explained this technique would likely be unsuccessful due to law enforcement's seizure of past shipments, subsequent arrest

after a controlled delivery, and difficulty penetrating DTO's hierarchy. (Gov't Ex. 1-3 at 38-39, Gov't Ex. 2-1 at 78-79).

15. Regarding physical surveillance, there was a risk of exposing the investigation in residential areas, which was further complicated by the agents' inability to identify and prosecute most people with whom DTO had conducted drug transactions. (Gov't Ex. 1-3 at 39-44, Gov't Ex. 2-1 at 79-85).

16. Regarding trash searches, it was noted that Mr. Parker's dumpster was a large public dumpster in a gated parking lot accessible with only a keycard, which prevented agents from accessing the dumpster and being able to identify Mr. Parker's trash among trash from other residents. (Gov't Ex. 1-3 at 44-45, Gov't Ex. 2-1 at 85-87).

17. Regarding mail covers, this information was limited to what was written on the outside of parcels and does not provide evidence of criminal activity. (Gov't Ex. 1-3 at 45-47, Gov't Ex. 2-1 at 87-89).

18. Regarding pole cameras, TFO Conner noted that they provide little to no corroborative drug distribution information nor context to visual surveillance. Additionally, agents had not been able to locate suitable locations for camera placement to observe known targets. (Gov't Ex. 1-3 at 47-48, Gov't Ex. 2-1 at 89-91).

19. Regarding GPS vehicle trackers, Mr. Parker had no vehicles registered in his name but many at his disposal, making it difficult to know what vehicle he would be operating. (Gov't Ex. 1-3 at 48-51, Gov't Ex. 2-1 at 91-93).

20. Regarding cellular telephone precise location and cell-site data, TFO Conner noted they only supply the general vicinity of the device and fail to assist in large population density and radius areas. (Gov't Ex. 1-3 at 51-53, Gov't Ex. 2-1 at 93-96).

21. Regarding search warrants, TFO Conner explained that warrants may jeopardize the investigation, would likely alert target subjects, law enforcement was unable to locate addresses for transient target subjects, and the fact that DTO's maintain many stash houses in unknown locations to thwart law enforcement from seizing all drugs and proceeds, and would unlikely reveal the DTO's supply source. (Gov't Ex. 1-3 at 53-57, Gov't Ex. 2-1 at 96-101).

22. Regarding pen registers and toll records, TFO Conner explained that they only provide a list of numbers called and does not establish the identities of the persons called or the content of conversations, while also explaining that fictitious names are often used. (Gov't Ex. 1-3 at 58-59, Gov't Ex. 2-1 at 101-103).

23. Regarding the use of grand jury subpoenas, TFO Conner explained that agents were not aware of any non-target witnesses who could provide grand jury testimony, and target subjects would likely be uncooperative and invoke their Fifth Amendment privilege not to testify. (Gov't Ex. 1-3 at 59-61, Gov't Ex. 2-1 at 103-105).

24. Regarding subject/witness interviews, TFO Conner noted that agents did not know of any other witnesses that had not already been interviewed who were able and willing to provide useful information pertaining to the Parker DTO or its affiliates, that the majority of the DTO members remained unidentified, and if a higher up member of the DTO were to be approached, they would likely inform other members and jeopardize the investigation and would unlikely provide information due to fear of retribution. (Gov't Ex. 1-3 at 61-64, Gov't Ex. 2-1 at 105-109).

25. Regarding arrests and buy/busts or buy/walks, TFO Conner explained that if they had arrested and charged Mr. Parker and known associates, they would no longer have

enough identifiable targets, and it would hinder the investigation to collect sufficient evidence to prosecute the entire DTO or identify their supply sources. (Gov't Ex. 1-3 at 64-65, Gov't Ex. 2-1 at 109-110).

26. Regarding financial investigations, TFO Conner explained that without the wiretaps, agents would not be able to acquire sufficient insight into the way the proceeds from sales of illegal drugs were laundered by the DTO and its affiliates. (Gov't Ex. 1-3 at 66-67, Gov't Ex. 2-1 at 110-112).

27. Regarding social media, TFO Conner detailed that agents had checked unsecured Facebook accounts of specific targets, and the evidence did not show that targets were using Facebook or any other social media to distribute drugs. (Gov't Ex. 1-3 at 68, Gov't Ex. 2-1 at 112-113).

28. Regarding review of jail and prison communications, TFO Conner explained there were no known incarcerated targets, and the agents needed real time information from live monitoring between DTO members participating in day-to-day activities. (Gov't Ex. 1-3 at 68-70, Gov't Ex. 2-1 at 113-115).

## II. Discussion

Mr. Parker seeks to suppress evidence acquired from wiretaps on TT1 and TT2, arguing that the Government failed to make the requisite showing of necessity in its applications under 18 U.S.C. § 2518(1)(c). (Tr. 4:14-6:5). Mr. Parker further argues that the wiretap evidence should be suppressed because the Government's use of ordinary investigation techniques foreclosed the need for wiretaps. (*Id.*). The Government states that its affidavits sufficiently stated why wiretaps were necessary and performing ordinary investigations techniques did not foreclose its need for wiretaps. (Doc. 59 at 1). The Court recommends the District Judge find that the Government's

affidavits sufficiently stated the need for wiretaps in its investigation, which was not foreclosed by the Government's use of ordinary investigation techniques.

### A. Legal Standard

"[A]n application requesting a wiretap order must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003) (quoting 18 U.S.C. § 2518(1)(c)). Section 2518's necessity requirement insures "that wiretaps are not routinely employed as the initial step in an investigation." *United States v. Thompson*, 210 F.3d 855, 858-59 (8th Cir. 2000) (quoting *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994)).

To satisfy this requirement, the government need not exhaust "every available investigative technique," *see United States v. Terrell*, 912 F.3d 1125, 1129 (8th Cir. 2019), or "use a wiretap only as a last resort," *see United States v. Perez-Trevino*, 891 F.3d 359, 370 (8th Cir. 2018) (quoting *United States v. Macklin*, 902 F.2d 1320, 1327 (8th Cir. 1990)). Instead, it need only establish "that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator." *United States v. Armstrong*, 60 F.4th 1151, 1161 (8th Cir. 2023) (quoting *United States v. Merrett*, 8 F.4th 743, 749 (8th Cir. 2021)). "Whether the statutory requirement is met is determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous." *Terrell*, 912 F.3d at 1128-29 (quoting *Maxwell*, 25 F.3d at 1394).

### B. The Government's affidavits sufficiently stated the need for wiretaps in its investigation.

Mr. Parker argues that the Government's wiretap affidavits violated 18 U.S.C. § 2518(1)(c) because they inadequately described why normal investigative techniques "reasonably appear

unlikely to succeed if tried or to be too dangerous." (Doc. 54 at 2). The Government argues that its affidavits were sufficient. (Doc. 59 at 1). The undersigned recommends the District Judge find that the Government's affidavits sufficiently stated its need for wiretaps under 18 U.S.C. § 2518.

The affidavits, based upon the expert training and experience of the investigative agents and officers, established that the wiretaps were needed because normal investigative techniques by themselves would not have been as successful or, if used, would have been unnecessarily dangerous. *See United States v. Davis*, 882 F.2d 1334, 1344 (8th Cir. 1989) (finding "an affidavit provides ample information to establish probably cause if it presents facts and circumstances that, when viewed in their totality, support a 'reasonable belief' that by employing the wiretap incriminating evidence against the target of the investigation will be obtained").

The two orders at issue, each with separate supporting applications and affidavits, authorized wiretaps that generated evidence which Mr. Parker seeks to have suppressed: (1) 24-WT-0001-MDH, on February 22, 2024, and (2) 24-WT-0003-MDH, on March 22, 2024. Both applications described the general investigation and wiretap goals:

> In particular, there is probabl[e] cause to believe that these communications will concern the specifics of the Target Offenses, including: (i) the manner, scope, and extent to which the Target Telephones are being used to facilitate the Target Offenses, the existence of a conspiracy, evidence of the identities and roles of the Target Subjects and their unidentified co-conspirators, and the precise nature and scope of their illegal activities; …(ii) the identities of the co-conspirators and aiders and abettors…; (iii) the methods used by the organization(s) to collect and launder the illegal proceeds from the distribution and sales of controlled substances; (iv) the dates, times, and places of the Target Subjects' controlled substance deliveries, shipments, and payments; (v) the locations where the Target Subjects and their co-conspirators are storing controlled substances; (vi) the identification of vehicles and money involved in those activities; (vii) the existence and location of the books and records, computer disks, ledgers, telephone address books, telephone answering devices, photographs, video equipment, personal data/digital assistants, digital recorders, and other methods used and documents kept to record the criminal activity, that support the existence of a conspiracy, and provide evidence of the identities and roles of the coconspirators; (viii) the location and source of resources used to finance the illegal activities of the Target Subjects and their co-conspirators; (the location and disposition of the proceeds from those activities; (ix) the communication facilities…; (x) the other

methods used to communicate with the co-conspirators and aiders and abettors of the Target Subjects and others yet unknown…; (xi) the nature of the criminal relationship between the Target Subjects, the suppliers of controlled substances, and the customers of the organization; (xii) the nature and relationship among the Target Subjects and others yet unknown… (xiii) admissible evidence of the commission of the Target Offenses and proof beyond a reasonable doubt of the intent of each of the participants to join in the conspiracy knowingly and willingly, to participate in it voluntarily, and the scope of the conspiracy, specifically the amount of methamphetamine distributed by the organization.

(Gov't Ex. 1-3 at 3–4; Gov't Ex. 2-1 at 5–6).

To accomplish these goals, TFO Conner noted in his wiretap affidavit for TT1 that investigators had oral and written reports from federal and local agents, confidential sources, and cooperating witnesses who had conducted controlled purchases, physical surveillance, electronic surveillance including mobile-device tracking, reviews of pen registers, trap and trace devices, telephone toll record information, and arrests, searches, and seizures of suspected methamphetamine. (Gov't Ex. 1-3 at 16).

Similarly, in his wiretap affidavit for TT2, TFO Conner noted that investigators had collected information from the previous wiretap, confidential sources and cooperating witnesses who had conducted controlled purchases, physical surveillance, electronic surveillance including mobile-device tracking, reviews of pen registers, trap and trace devices, telephone toll record information, and arrests, searches, and seizures of suspected methamphetamine. (Gov't Ex. 2-1 at 9–10).

Finally, in his wiretap affidavits for TT1 and TT2, TFO Conner detailed the limitations of each investigative technique and how each technique was unable to achieve investigation goals without a wiretap. (*See* Gov't Ex. 1-3 at 33–69; *see also* Gov't Ex. 2-1 at 73–115). Collectively, the affidavits stated that the following investigative techniques have been attempted and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ: prior wiretaps, confidential sources and confidential witnesses, undercover agents, physical

surveillance, trash searches, mail covers, pole cameras, GPS vehicle trackers, cellular telephone precise location and cell-site data, search warrants, pen registers and toll records, use of grand jury subpoenas, subject/witness interviews, arrests and buy/busts or buy/walks, financial investigations, social media, and review of jail and prison communication. (*Id.*).

Mr. Parker argues the wiretap affidavits "inadequately described why normal investigative techniques 'reasonably appear unlikely to succeed if tried or to be too dangerous.'" (Doc. 54 at 2). The undersigned disagrees. The stated overall goals of this investigation indicate the complexity of the DTO under investigation. TFO Conner's affidavits explain that without wiretap communications, the identities of all drug suppliers, transporters, storage locations, identities of other co-conspirators, and DTO methods to collect and launder illegal proceeds would remain unknown. (Gov't Ex. 1-3 at 35; Gov't Ex. 2-1 at 73). "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." *Jackson*, 345 F.3d at 644. Accordingly, the undersigned recommends the District Judge find that the wiretap affidavits satisfied Section 2518's necessity requirement.

### C. The Government's use of ordinary investigative techniques does not foreclose the need for wiretaps.

Mr. Parker further argues that the wiretap evidence should be suppressed because "if normal investigative procedures accomplish the goals of the investigation, then there is no need for the wiretap[s]." (Tr. 7:18-19, Doc. 62 at 7-13). The Government argues that investigative methods producing some evidence does not negate the necessity of a wiretap to advance the investigation. (Doc. 59 at 1). The undersigned recommends that the District Judge find that the Government's use of ordinary investigation techniques did not foreclose its need for wiretaps.

The wiretaps at issue were used after other investigative techniques had been attempted. However, Section 2518's necessity requirement does not mandate that law enforcement officers "exhaust all possible techniques before applying for a wiretap." *Thompson*, 210 F.3d at 859 (internal citations omitted). In *United States v. Milliner*, 765 F.3d 836, 839–40 (8th Cir. 2014), the defendant in a drug conspiracy case argued that the government did not need wiretaps because it had enough information pre-wiretap to prosecute conspiracy members. The Eighth Circuit noted that while "there may have been enough evidence to prosecute some actors, there was not enough to effectively prosecute everyone involved." *Id*. at 839. The Court ultimately found that the government's wiretaps were necessary:

> The wiretaps issued for telephones # 1 and # 4 were requested to shed light on the full scope of the crack conspiracy. The DEA agent's affidavit details the techniques attempted: surveillance, confidential sources, controlled purchases, trash seizures, electronic toll-record analysis, interviews with targets and witnesses, grand jury testimony, subpoenas of financial and tax information, review of police records, GPS devices, and a pole camera. Despite all these techniques, the government still did not know where [drug trafficker] obtained the cocaine, how he laundered the proceeds from the sales, and where he stored the drugs or the proceeds.

*Id*. at 839–40. *See also United States v. Turner*, 781 F.3d 374, 383 (8th Cir. 2015) (noting that "while traditional investigative techniques had uncovered a great deal of information," law enforcement still needed to determine who was supplying the drugs, where the drugs were being stored, and what the structure of the drug organization looked like); *Maxwell*, 25 F.3d at 1394 (finding wiretap necessary where officers were unable to determine from other investigative methods the scope of the conspiracy or to develop enough evidence to successfully prosecute suspects identified).

The factual record above demonstrates that the described investigative techniques were either used with some, but not sufficient success, or were considered and determined to be unsuited

for acquiring necessary information. TFO Conner indicated that based on his training, experience, and consultation with other agents, using "traditional" investigative techniques alone would not achieve all the goals of the investigation. (*See* Gov't Ex. 1-3, *see also* Gov't Ex. 2-1); *see also United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009) (concluding that wiretap necessity was established where "the government had obtained a significant amount of information about the extensive drug operation in which [the defendant] was a primary player" but "had not uncovered the source of cocaine in which he dealt."). Accordingly, the undersigned recommends that District Judge find Government's use of ordinary investigation techniques did not foreclose its need for wiretaps.

### III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant Dejuan T. Parker's Motion to Suppress Wiretaps.

Counsel is reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dates this 31th day of December 2024, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*

Willie J. Epps, Jr.
Chief United States Magistrate Judge